UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

CASE NUMBER: 7:15-cr-00004-DCR

UNITED STATES OF AMERICA                                             PLAINTIFF

V.

BRETT A. DUNNING                                                     DEFENDANT

## DEFENDANT'S SENTENCING MEMORANDUM

Brett A. Dunning, by counsel, submits this Sentencing Memorandum in support of a

Short sentence of imprisonment, a significant period of home detention with electronic

monitoring, and ten years of supervised release with conditions. This sentence reflects the nature

and circumstances of Mr. Dunning's offense and his history and characteristics, and is

"sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18

U.S.C. § 3553(a)(2).

## INTRODUCTION

### A. Nature and Circumstances of Mr. Dunning's Offense, History and Characteristics.

Brett Dunning was born on June 27, 1962 in McKenzie, Carroll County, Tennessee. Mr.

Dunning has lived the majority of his life in Carroll County, Tennessee. Mr. Dunning received

his GED in 1981. From 1983 through 1986, Mr. Dunning was in the United States Navy. During

his period of military service, Mr. Dunning was stationed at the Naval Station Great Lakes in

Lake County Illinois. Mr. Dunning was honorably discharged from the Navy and attained the

rank of E4. Since that time Mr. Dunning has worked as an EMT and as a nurse before becoming

a Doctor of Osteopathic Medicine in 2005.  Mr. Dunning received his doctorate of osteopathic

medicine from the University of Pikeville, Kentucky College of Osteopathic Medicine.

Mr. Dunning then worked at the Pikeville Medical Center from June 27, 2005 to January 10, 2010. Then he was employed by Dunning Medical Clinic in Prestonsburg, Kentucky until April 30, 2013. Mr. Dunning has lost his medical license due to this matter.

Mr. Dunning was arrested by Kentucky state authorities in Floyd County, Kentucky on April 30, 2013. This case was dismissed on June 12, 2015. Mr. Dunning was arrested by federal authorities pursuant to a Federal Court warrant and on May 19, 2015, Mr. Dunning was released on his own recognizance with pretrial supervision. Since the April 30, 2013 arrest by Kentucky authorities, Mr. Dunning has had no other violations of law and has had no pre-trial violations in state or federal court in this matter.

Mr. Dunning used the Gnutell peer to peer file sharing network and the eDonkey file sharing system. On April 29, 2013 a KSP detective queried the IP address 74.214.188.249 in the database which revealed the IP address was now showing 176 notable files containing child pornography images. Mr. Dunning was found to be in possession of approximately 22,179 images containing child pornography and approximately 1,059 videos containing child pornography. However, a KSP detective advised that after Dunning downloaded an image of child pornography via the P2P programs, he would immediately transfer the downloaded image from the shared folder to another created folder. This caused other P2P users to be *unable* to access Dunning's shared folder and obtain his images of child pornography.

**B.  Guideline Discussion**

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007,  it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be

considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*,

552U.S. 85, 90 (2007) )(portions of this memorandum was taken

fromhttps://www.fd.org/docs/select-topics---sentencing/sample-sentencing-memo-in-child-

pornography-case.pdf). The Court must "consider all of the § 3553(a) factors," "make an

individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts

relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-

43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater

than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly

advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter

of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary

[from Guidelines ranges] based solely on policy considerations, including disagreements with the

Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United

States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself

fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*,

because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be

an abuse of discretion for a district court to conclude when sentencing a particular defendant that

the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s

purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v.

United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack

cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would

otherwise justify a variance from the Guidelines' sentencing range."). Congressionally directed

guidelines are just as advisory as any other guideline and therefore equally subject to policy-

based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). As the Sixth Circuit has previously recognized, "*all* of the sentencing guidelines are advisory," including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009)(emphasis in original). Congressional directives "tell the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id*. at 328.This Court may thus properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.

    In *Bistline*, the Sixth Circuit made a distinction between guidelines that are directed by Congress (like much of the child pornography guideline), and guidelines that are chosen by the Commission (like the drug guidelines at issue in *Kimbrough*, which were directly based on congressional policy but not specifically required by Congress). *See United States v.*

*Bistline*, 665 F.3d 758, 763-64 (6th Cir. 2012). With respect to guidelines chosen by the Commission, when the Commission "makes a policy decision for reasons that lie outside its [empirical] expertise," the resulting guideline is "vulnerable on precisely that ground." *Id*. With respect to guidelines directed by Congress, "the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*." *Id*. at 764. "[W]ith respect to those enhancements" that were directed by Congress, the district court "must refute . . . Congress's reasons." *Id*. This Court "may still disagree with the policies embodied in [congressional] directives," but "to survive the close scrutiny that follows, the court must explain its disagreement in terms that are persuasive on policy grounds." *Id*. at 763.

## C. Sentencing Commission Discussion

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for *non-production* offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323. The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi;

*id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.* In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Gnutell peer to peer (P2P) file sharing network and the eDonkey file sharing system, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and

one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (*e.g.*, for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked

Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii,322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, *distribution*, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability(*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

**D. Appropriate Sentence**

Mr. Dunning request a sentence of some imprisonment, a significant period of home detention with electronic monitoring, and ten years of supervised release with conditions. This sentence reflects the nature and circumstances of Mr. Dunning's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). Mr. Dunning is a low risk to reoffend and he has no prior criminal history. The fact that since Mr. Dunning's April 30, 2013 arrest by Kentucky authorities, Mr. Dunning has had no other violations of law and has had no pre-trial violations in state or federal court in this matter shows that Mr. Dunning will be a perfect candidate for supervise release with conditions.

**ARGUMENT**

In enacting the Sentencing Reform Act, Congress did "not favor one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id*. at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). *Id*. at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id*.; *see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

In the highly publicized Jared Fogle case, the Federal prosecutors asked for a 12 and ½ year sentence and Judge Tanya Walton Pratt sentenced Jared Fogle to 15 years and 8 months. *http://money.cnn.com/2015/11/19/news/companies/jared-fogle-jail-sentence/*. Jared Fogle was charged with one (1) count of distribution and receipt of child pornography and conspiracy to distribute and child pornography per 18 U.S.C. 2252(a)(2) and one (1) count of travel to engage in illicit sexual conduct with a minor and attempting to travel to engage in illicit sexual conduct with a minor per 18 U.S.C. 2423(b). *See U.S v. Jared Fogle Information dated August 19, 2015*. Around March 2011 and on or about January 30, 2015, the head of Fogle's charity used 12 Victims to engage in sexually explicit conduct for the purpose of secretly producing Visual depictions of such conduct. This included multiple Video and images. These images and Videos included indecent exhibition of the genitals or pubic area of the minors, while

some material also included other sexually explicit conduct depending upon the minors involved and precise content. *Id*. These victims did not know that they were being secretly filmed. Rather, the images or Videos were produced using multiple hidden cameras concealed in clock radios positioned so that they would capture the minors changing clothes, showering, bathing, or engaging in other activities. These images and videos where then distributed to Fogle. *Id*. Further, Fogle *engaged in sexual acts with two minors* and solicited sexual acts from these minors. Fogle repeatedly sent text messages to several escorts other minor victims soliciting them to provide him with access to minors as young as 14 to 15 years for purposes of commercial sex acts with him. *Id*.

The Fogle case involved interstate travel to pay minors for sex, as well as at least 400 child pornography videos in which Fogle received many from the head of his charity. *http://www.npr.org/sections/thetwo-way/2015/11/19/456622271/jared-fogle-to-learn-sentence-for-sex-with-minors-child-pornography*. "[Mr. Fogle's] child pornography crime began when he learned that alleged co-conspirator Russell Taylor was sexually exploiting a 14 year old girl in March 2011. At that time, Mr. Fogle did nothing to stop the abuse or report it to authorities, but chose instead to receive and repeatedly view the child pornography involving the girl and those other minors produced by his alleged co-conspirator in the years that followed. It total, Mr. Fogle admitted in court pleadings filed today that his actions caused the sexual victimization of a total of 12 minors in Indiana before his co-conspirator's arrest in April 2015. He preyed on minor victims who did not have the ability to protect themselves." *Id. quoting U.S. Attorney's office.* Authorities said Fogle offered to pay adult prostitutes a finder's fee if they could connect him with minors for sex acts, including some as young as 14 or 15 years old.

*http://www.chicagotribune.com/news/nationworld/ct-jared-fogle-subway-child-porn-20150819-story.html.*

Here, all of the purposes of sentencing point in the same direction. Mr. Dunning's offense is less serious than the offenses Congress had in mind, and Mr. Dunning is not the dangerous offender Congress envisioned. Incarceration is not necessary to protect the public, and would be a particularly harsh punishment for Mr. Dunning, who is 53 years old and suffers from health problems, and is probably unable to protect himself against any violence that might befall him in prison. Mr. Dunning's age, family circumstances, education, and employment history point to a very low risk of further offending.

**A. 18 U.S.C. § 3553(a)(2)(A)**

*1. Seriousness of the offense*

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters. Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general, *see Child Porn Report* at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"),Mr. Dunning has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. *See Dr. Fannin Affidavit*. This distinguishes Mr. Dunning from the offenders Congress had in mind, and is therefore highly relevant. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F.

Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober,* 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010)*.* The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Child Porn Report* at 204.

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. *See* 136 Cong. Rec. S4730 (Apr. 20, 1990). Aside from the evidence that disproves this belief in general, *see* Part IV.A.2, *infra*, Mr. Dunning did not pay for or trade any images. Moreover, there is no communication or contact between Gnutell peer to peer (P2P) file sharing network and the eDonkey file sharing system users: Just as Gnutell peer to peer

(P2P) file sharing network and the eDonkey file sharing system did not notify Mr. Dunning when

it shared images from his computer with the FBI agent, Gnutell peer to peer (P2P) file sharing

network and the eDonkey file sharing system did not notify the person(s) from whose

computer(s) it obtained images it sent to Mr. Dunning. Indeed, as an FBI agent testified in

another case, when law enforcement downloads files from Gnutell peer to peer (P2P) file sharing

network and the eDonkey file sharing system, it is not contributing to the global demand for

child pornography and not causing any new child pornography to be made because the files

already exist and no financial or other incentive is given. Under these circumstances, where no

economic or other incentive was given to anyone to create or post more or newer images, there

was "no market effect" from Mr. Dunning's actions. Troy Stabenow, *A Method for Careful

Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108,

124-25 (2011) [Stabenow, *A Method for Careful Study*].

There is no research to support the theory that criminal punishments have affected the

child pornography markets since the advent of the Internet and file sharing programs. *Child Porn

Report* at 98. In addition, technology has changed the nature of this offense. In the past, child

pornography had to be obtained in a risky and secretive manner for substantial sums of money,

whereas today, images of child pornography are available for free in the privacy of one's home,

with no planning and minimal effort. As a result, less dangerous people commit this offense than

was previously the case, even though the guideline range is much higher than it was previously.

Before widespread dissemination on the Internet, only those bold enough to seek out child

pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994

and 1995, the government prosecuted a total of only 90 defendants convicted of possessing,

receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g.

Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) [U.S. Sent'g Comm'n, *1996 Report*]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei *et al.*, *Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased. *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For* whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously.

According to the Commission, "technological changes have resulted in . . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." *Child Porn Report* at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among

offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23, such as those like Mr. Dunning who did not deliberately or discriminatingly select or catalogue their images, *id.* at 84-92.

While Mr. Dunning intentionally accessed and viewed child pornography, *see* 18 U.S.C. §2252(a)(4)(B), he did not knowingly share files. Any distribution that occurred was the automatic result of the Gnutell peer to peer (P2P) file sharing network and the eDonkey file sharing system program. As the Federal Trade Commission has explained, "[s]ome users may not understand the configuration of the P2P file-sharing software's 'shared folder' and may inadvertently share sensitive personal files residing on their hard drives." Staff Report, Federal Trade Commission, *Peer-to-Peer File-Sharing Technology: Consumer Protection and Computer Issues* 7 (2005). "Some consumers may distribute [child pornography] files unintentionally" because "P2P file-sharing software often is configured so that any file a user downloads isautomatically made available for redistribution to anyone else using the software." *Id.* at 11. We again reiterate the files were put into a non-sharable folder.

That is what happened here. "Because of the nature of peer-to-peer file sharing programs, a simple possessory crime evolves into a distribution offense as soon as someone accesses a shared file." *United States v. Strayer*, 2010 WL 2560466, at *12 (D. Neb. June 24, 2010). The Commission acknowledges that the guidelines should, but do not, distinguish among offenders based on their technological sophistication. *See Child Porn Report*, at viii, xix, 56-62. In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3). Congress set the statutory range of imprisonment for Mr. Dunning's offense at five to twenty years, and authorized a term of probation. *See* 18 U.S.C. §

2252(b)(2); 18 USC § 3561(a); 18 USC § 3559(a). The bottom of Mr. Dunning's guideline range of 135-168 months before a reduction for acceptance of responsibility exceeds the statutory maximum by *two years*. Even after a three-level reduction for acceptance of responsibility, the top of the guideline range of 97-121 months still exceeds the statutory maximum. As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders. As the Sixth Circuit has observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. *See United States v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012); *cf. United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007).

In *United States v. Bridgewater*, 479 F.3d 439 (6th Cir. 2007), cited by the Sixth Circuit in *Poynter* as the kind of case in which a child pornography possessor *would* be deserving of the statutory maximum, the Sixth Circuit affirmed a 10-year statutory-maximum sentence. The district court had concluded that Bridgewater was "too dangerous" to be "placed on probation and *See, e.g.*, *United States v. Durham,* 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 868 F. Supp. 2d at 1208-09; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. sent back into the community." *Id*. at 440. He took "photographs of [himself] molesting young girls who were in [his] care" while running a home for abused and neglected children, successfully concealed these offenses and his criminal past from others "despite [his] continued proximity to youth in church programs," and his own son "condemned" him and "questioned his remorse and sincerity" in a letter to the court. *Id*. at 440-42. The Sixth Circuit has

also given examples of factors that in general might justify a sentence at or approaching the statutory maximum as, for example, fleeing from authorities, failing to accept responsibility, using violence, or having prior convictions for of sex offenses with children. *See Aleo*, 681 F.3d at 302; *Poynter*, 495 F.3d at 354. Mr. Dunning's conduct and characteristics could not be farther from these. He has never improperly touched a child, he did not share files, and he has fully accepted responsibility for his offense. Dr. Fannin concluded that he presents no risk of ever harming a child. His family and colleagues report that this behavior was not consistent with his character and believe that he will never engage in that kind of behavior again.

One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal, as several courts have noted. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. A defendant who used a computer to entice a 12-year-old to engage in illegal sexual activity, but was caught before actually having sex with the child, would receive an offense level of 30, *see* § 2G1.3(a)(3), (b)(3), three levels *below* Mr. Dunning's offense level under § 2G2.2. In order to receive an offense level of 33 as Mr. Dunning did for viewing child pornography, one could, for example, attempt to commit first degree murder, *see* § 2A2.1(a)(1); commit rape resulting in more than serious but less than permanent bodily injury, *see* §2A3.1(a)(2), (b)(4); hold a person in involuntary servitude for over a year by use of a weapon and cause permanent bodily injury, *see* § 2H4.1(a)(1), (b)(1), (b)(2), and (b)(3); or rob a bank of $800,000, while brandishing a weapon and causing bodily injury, *see* § 2B3.1(a), (b)(1), (b)(2),(b)(7).

Dunning recognizes the great harm inflicted on the victims depicted in these images. He clearly understands that his behavior was unlawful.

*2. Just punishment*

The same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's remaining life and can amount to a life sentence. *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness). For example, the three-year prison sentence that Brian Gall was facing in his mid-twenties that the district court reduced to probation, *see Gall*, 552 U.S. at 41-45, pales in comparison to a similar sentence for a defendant like Mr. Dunning who is 53 years old and has multiple serious health problems. Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf. Offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates. *Id*. at 10.  For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005). A 53-year-old inmate with Mr.

Dunning's health problems is likely to suffer greater punishment than the average inmate because the Bureau of Prisons often fails to provide adequate or even necessary medical treatment. An audit by the Office of the Inspector General found that the Bureau of Prisons often does not provide "required medical services to inmates." U.S. Dep't of Justice, Office of the Inspector General, Audit Division, *The Federal Bureau of Prisons' Efforts to Manage Health Care* 32, 34 (2008). Preventive services are often not provided, chronic conditions (such as high blood pressure) and medication side effects are often not monitored, and unqualified persons are providing services. *Id*. at ii-xx, 32-34, 51-52. As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics

of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

**B. Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

There is empirical evidence that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); MichaelTonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism

and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." *Child Porn Report* at 98.

**C. Incarceration, 18 U.S.C. § 3553(a)(2)(C)**

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case. Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any

kind], in contrast to those with any prior or concurrent criminal convictions or those who engage

in other sexual offending (e.g., attempted or actual contacts with a child, production of child

pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g.

Comm'n at 4 (Feb. 15, 2012), and "online offenders who had no history of contact offenses

almost never committed contact sexual offenses." Michael C. Seto *et al.*, *Contact Sexual*

*Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also*

Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22

(Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under

supervision, including three production offenders, with varying criminal histories, two were

arrested for possessing child pornography and none were arrested for a contact offense within

four years);9 Helen Wakeling *et al.*, *Comparing the Validity of the RM 2000 Scales and OGRS3*

*for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment

146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of

escalation to contact sexual offenses."); Jérôme Endrass *et al.*, *The Consumption of Internet*

*Child Pornography and Violent Sex Offending,* 9 BMC Psychiatry 43 (2009) (study that followed

231 child pornography offenders for six years after initial offenses found that only two offenders

(0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact

sexual offense, and concluded that "the consumption of child pornography alone does not seem

to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects

without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The*

*Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201,

207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography

offending only recidivated with contact sex offenses; "our finding does contradict the assumption

that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature generally concludes that there is little—if any— evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall*, 870 F. Supp. 2d at 492.

Not only are child pornography offenders at low risk to re-offend in general, Mr. Dunning's history and characteristics make him a very low risk to re-offend. According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50. U.S. Sent'g Comm'n, *Measuring Recidivism* at 12 & Exh.9. For sex offenders, too, recidivism declines with age, and only a very few child sex offenders recidivate after age 60. *See* R.K. Hanson, *Recidivism and Age: Follow-up Data from 4,673 Sexual Offenders*, 17 J. Interpers. Violence 1046, 1054 (2002). "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of*

*Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011). The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population. "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified." William E. Adams, *The Incarceration of Older Criminals: Balancing Safety, Cost, and Humanitarian Concerns*, 19 Nova L. Rev. 465, 466 (1995).

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex.; U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004), as does substantial other research.  In short, Mr. Dunning's age, long marriage, strong family support, education and gainful employment until his arrest, strongly support the conclusion that he is most unlikely to re-offend. While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Dunning is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that Mr. Dunning will never view child pornography again. Supervised release with appropriate conditions is more than sufficient than incarceration to ensure that he never does.

## II. Disparities

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing.

"Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

The guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Mr. Dunning's characteristics demonstrating that there is no need to imprison him to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community. In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Dunning and dissimilar defendants who committed dissimilar conduct. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108.  In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range. Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based on a government motion for a variance, and in 3% of cases based on a government motion under § 5K1.1. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.

In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Mr. Dunning. *See Placement of Sentences*

25

*Under U.S.S.G. §2G2.2 – FY 2011* at 4, http://www.fd.org/docs/select-topics---sentencing/placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4. Of those forty-four defendants in Criminal History Category I, four had an offense level (unadjusted for acceptance of responsibility) of 33 or more. *Id*. at 5.

### III. Available Sentences

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3).  The Sixth Circuit recently indicated that a sentence of one day in custody, a significant period of home confinement, and ten years of supervised release with conditions would be a sufficient sentence in this case. In *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012), the defendant possessed 7,100 images, including images of torture and bondage, and the guideline range was 78-97 months. The judge varied downward based on Robinson's individualized circumstances, which included his older age (43) and a "debilitating back condition," and imposed a sentence of one day in prison and five years' supervised release, without any period of home confinement. *Id.* at 772, 775. Although the Sixth Circuit reversed the sentence as substantively unreasonable, its analysis indicates that if the court had imposed a period of home confinement of 12 or 18 months, the sentence would have been sufficient. First, it said that the sentence would not deter others because it was "devoid of any significant period of incarceration, home confinement, or substantial fine." Second, in discussing the need to avoid unwarranted disparities, it distinguished the sentence imposed in Robinson's case from two other one-day sentences it had previously affirmed, *see United States v. Stall*, 581 F.3d 276 (6th Cir. 2009), and *United States v. Prisel*, 316 F. App'x 377 (6th Cir. 2008), on the ground that those sentences included a significant fine or period of home detention. *Id.* at 779.

26

In *Stall*, the defendant had only 18 images at the time of his arrest, but he had downloaded, viewed, then deleted an unknown number of images over a period of at least five years. He received the enhancement for images depicting sadistic or masochistic conduct, and faced a guideline range of 57-71 months. 581 F.3d at 276. In light of the evidence and arguments made at sentencing, the Sixth Circuit upheld as reasonable the sentence of one day in prison, 12 months' home confinement, 10 years' supervised release, and a $5,000 fine, emphasizing that the defendant was in treatment while monitored on supervised release. *Id.* at 277-78, 283.13 In distinguishing *Stall*, the court in *Robinson* described Stall's sentence as "more severe than Robinson's" because it included a "significant period" of home confinement, and emphasized that the district court in *Stall* "conduct[ed] an extensive analysis of how a [five-year] term of supervised release would restrict [the defendant's] freedom and protect the public and explain[ed] why the district court believed this sentence will deter similar offenders and why this case warranted a variance." *Robinson*, 669 F.3d at 779 (alterations in original, internal quotation marks omitted).

In *Prisel*, the defendant possessed 1,189 images and had paid for videotapes. Under a previous version of the guideline (before the PROTECT Act increases), the applicable guideline range was 27-33 months. 316 F. App'x at 379. Citing a psychological evaluation indicating the defendant presented no danger to children, the defendant's mental and emotional condition, and family responsibilities, the district court imposed a sentence of one day in prison, three years' supervised release, 18 months home confinement, and a $6,000 fine. *Id.* at 380. In affirming the

sentence, the Sixth Circuit emphasized the fact that the sentence included 18 months of home detention during the period of supervised release. *Id.* at 385-86. In distinguishing *Prisel*, the court in *Robinson* said that Prisel's sentence was "more severe than Robinson's" because it included a "significant period" of home confinement. *Robinson*, 660 F.3d at 779.14

In addition, although there was no policy disagreement in *Robinson*, the court of appeals acknowledged that there are grounds for a policy disagreement with the child pornography guideline. It said that an enhancement that applies in "almost every case"—such as the computer enhancement—is contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense," and that as a result, § 2G2.2 is "an anomaly." *Id.* at 778. Regarding the number-of-images enhancement, it said that "in the computer age, [it] ha[s] some doubt that the number of pictures alone captures the gravity of the crime of possession of child pornography." It recognized that "quantifiable measurements"—like the amount of drugs in a drug case, the amount of loss in a fraud case, and the number of images in a child pornography case—may overstate the seriousness of the offense. *Id.* at 778 & n.3. In particular, it suggested that the number-of-images enhancement overstates the gravity of the offense for those who share files but do not necessarily know the number of images to be received, and results in unwarranted disparities because it applies to those who view, trade, and save a large number of files while ignoring those who view, trade, and delete the same. The court in *Robinson* said that *Prisel* was decided under plain error review, *Robinson*, 669 F.3d at 779, but this is not correct. While the court in *Prisel* rejected some of the government's *new* appellate arguments under plain error review, it ultimately reviewed the

sentence imposed for abuse of discretion: "[T]aking into account the totality of the circumstances, . . . we conclude that the district court did not abuse its discretion in departing downward 27 months from the advisory Guidelines range." *Prisel*, 316 F. App'x at 388. number. *Id.* at 778-79. It said the enhancement more appropriately applies to a defendant who

"acquired a large number of images" "over a long period of time" and who "paid money" for images. *Id.* These cases make clear that the requested sentence is sufficient. Here, Mr. Dunning did not pay for, trade, or knowingly share any images. Though *Stall* had fewer images on his computer, he viewed many more and then deleted them for at least five years. Mr. Dunning viewed child pornography for no more than two years. Mr. Dunning like *Prisel,* presents no danger to children. Unlike Robinson, who was 43 years old and suffered only from back pain, Mr. Dunning is 53 years old and suffers from multiple  medical problems. Mr. Dunning is suffering from the following medical conditions: hypertension, gastro esophageal reflex disease, chronic bleeding hemorrhoids, microcytic/hypochromic anemia including blood loss, irritable bowel syndrome including diarrhea, osteoarthritis, obesity, COPD (chronic obstructive pulmonary disease), left ventricular hypertrophy, and presbyopia with astigmatism, and sleep apnea.

Thus, if adequately justified, a sentence of some imprisonment, a significant period of home detention, and ten years of supervised release with special conditions should be upheld by the Sixth Circuit.

## IV. Purposes of Sentences

In the time since the guideline for possession of child pornography was first promulgated, the offense level applicable to Mr. Dunning's offense before acceptance of responsibility has risen by 23 levels, from 12 to 35 and the applicable range has risen from 6-12 months to 168-210

months, an increase of more than **1,600%.** Most of this massive increase was mandated by Congress. Under the Sixth Circuit's decision in *Bistline*, with respect to enhancements mandated by Congress, this Court must refute Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d at 763, 764. With respect to enhancements adopted by the Commission without a congressional mandate *and* without empirical grounds, the guideline is vulnerable precisely on that ground. *Id*. at 764.

In *Kimbrough*, the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. at 94-99. Likewise, Congress, in dictating much of the content of § 2G2.2, relied on "assumptions . . . that more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has now released a report that recommends ameliorating changes to the child pornography guideline. *See Child Porn Report* at 320-24. Meanwhile, the Sixth Circuit's account of Congress's reasons in *Bistline* is incomplete and in part inapposite. It cited two sources for the "grounds" of congressional action in raising offense levels under § 2G2.2: (1) a directive to the Commission set forth in Pub. L. No. 108-21, §513(c) (2003), and (2) an observation by the Commission that "Congress has demonstrated its continued interest in deterring and punishing child pornography offenses." 665 F.3d at 764. The directive cited by the court in *Bistline* is not relevant to the guideline range in this case. It stated that the "Commission shall review and, as appropriate, amend the Federal Sentencing Guidelines and policy statements to ensure that the guidelines are adequate to deter and punish conduct that involves a violation

of" 18 U.S.C. § 2252A(a)(3)(B), which criminalized pandering, "or" 18 U.S.C. § 2252A(a)(6),

which criminalized distribution of child pornography to a minor for purposes of inducing the

minor to participate in illegal activity. Pub. L. No. 108-21, § 513(c) (2003). Mr. Dunning was not

convicted of either offense, and the directive had no effect on his guideline range.

**A. Increased Penalties- Inappropriate.**

Congress directed the Commission to take four actions relevant to Mr. Dunning's

guideline calculation: (1) increase the base offense level from 10 to 13 in 1991; (2) increase the

base offense level from 13 to 15 in 1995; (3) expand the definition of "distribution" to include

"non-pecuniary interest"; and (4) add the 2-level enhancement for use of a computer. Congress

itself added the 4-level enhancement for materials depicting sadistic or masochistic conduct and

the number-of-images table, which included the 5-level enhancement for 600 or more images.

Congress did not make formal findings in support of any of these actions, but its reasons can be

gleaned from the legislative history. This history suggests that Congress acted on three

primary beliefs: (1) child pornography possessors are pedophiles who use pornography to

sexually abuse children; (2) increasing penalties for possessors will dry up the market and

thereby prevent the sexual abuse of children by removing the market incentive for those who

abuse children for the purpose of producing new images; and (3) severe penalties will deter

others from possessing child pornography. Each belief is based on assumptions that current

empirical evidence refutes.

*1. The belief that child pornography possessors are pedophiles who use pornography to molest
children*

When it directed the Commission in 1991 to increase the base offense level from 10 to

13, Congress acted on the belief that those who possess child pornography are actually predatory

child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on "predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley). When it directed the Commission to define "distribution" to include distribution for "a nonpecuniary interest," Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch). And while there was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements. *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. However, this belief is not supported by current research. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its*

*Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012). Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id.* at 1723. Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id.* at 1715. The Commission confirms that "not all child pornography offenders are pedophiles or engage in other sex offending." *Child Porn Report* at 104. Mr. Dunning has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Dunning from the offenders Congress had in mind. Nor is there any evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. When Congress added the enhancement for sadistic or masochistic materials to § 2G2.4 for possession offenses, it simply mirrored the same enhancement the Commission had added to § 2G2.2 for trafficking offenses in 1990, which in turn mirrored the same enhancement under § 2G3.1, the adult obscenity guideline. *See* U.S. Sent'g Comm'n, *History* at 15 n.68. The § 2G3.1 enhancement, in turn, was not based on empirical evidence; indeed, the Commission had proposed eliminating it but retained it for the sole reason that the Department of Justice objected to its removal. U.S. Sent'g Comm'n, *Working Group on Child Pornography and Obscenity Offenses and Hate Crime* 42, 45 (1990).

The Commission confirms that technological advances have made large numbers of graphic images readily available so that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct," and over two-thirds of possession-only offenders receive the enhancement for images depicting sadistic or masochistic conduct. *Child Porn Report* at 84, 209. At the same time, the enhancement for possession of sado-masochistic images are "generally not associated with significantly higher

rates of [criminal sexually dangerous behavior]." *Id.* at 204. This comports with other available evidence, which shows that the level of severity of the images possessed does not correlate to an increased risk of committing another child pornography offense or a contact offense. *See* Jody Osborn *et al.*, *The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. Aggression, Conflict & Peace Res. 16, 19 (2010).

The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 868 F. Supp. 2d at 1209. With the Internet and programs like Gnutell peer to peer (P2P) file sharing network and the eDonkey file sharing system, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124. The Sentencing Commission has now acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," *Child Porn Report* at 6, and that as the result, the current enhancement for number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id.* at 323. It also recommends that the enhancement be updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." *Id.* And, as with the enhancement for the nature of the images, the Commission confirms that the enhancement for number of images possessed is not "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. The Sixth Circuit, too, has recognized that the enhancement may overstate the seriousness of the offense, and more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time" and who "paid money" for images. *See Robinson*, 669 F.3d at 778 & n.3. Thus, not only is the number-of-images enhancement "not linked to any empirical

data pertaining to sentencing and the purposes of punishment," *see United States v. Schinbeckler*, 2011 WL 4537907, at *6 (N.D. Ind. Sept. 29, 2011), but according to the views of both the Sentencing Commission and the Sixth Circuit, it is particularly unsuited for those who, like Mr. Dunning, acquired during a relatively short period of time more than 600 images, some duplicates, never paid for or traded images, and did not knowingly save or share images.

*2. The belief that severe punishment for possession will dry up the market and prevent the abuse of children*

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade."). But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Dunning is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily

obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* (2010) ["UNDOC, *Globalization of Crime*"], and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs. *Child Porn Report* at 98. Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Commission to increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. *See* U.S. Sent'g Comm'n, *1996 Report*, at 28-30 & n.23; *see also Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction."). Here, Mr. Dunning did not use his computer to trade or knowingly disseminate images, or to make images accessible to children. He is not the offender Congress had in mind. Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak *et al.*, *Arrests for*

*Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and

citation omitted); *United States v. Raby*, 2009 WL 5173964, at \*\*6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of having even 592 additional images is miniscule.").

*3. The belief that punishing possessors of child pornography will deter the commission of child pornography offenses.*

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). The Sixth Circuit, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *Bistline*, 665 F.3d at 764. To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree *et al.*, *Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime – the overwhelming consensus of the literature is that treatment works, incarceration does not."). Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *Child Porn Report* at 278 & n.31 (quoting

Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy, and revising that policy in light of actual court sentencing experience over time." U.S. Sent'g Comm'n, *Mandatory Minimum Penalties in the Federal Criminal Justice System* 122-23 (1991).

## B. Commission Increases

*Increase to base offense level from 15 to 18.*

In 2004, the Commission increased the base offense level in possession cases from 15 to 18 "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, *History* at 44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground"). The Commission has since

acknowledged that the mandatory minimum to which Mr. Dunning's sentence is linked "may be excessively severe." U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 365 (2011). It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.*, and that prosecutorial charging practices suggest that prosecutors also believe that the mandatory minimum penalty is too high. *Id.* Thus, the current base offense level is not only devoid of empirical basis, but contrary to national experience.

**C. Enhancements.**

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011). These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09. As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an "anomaly." *Id.*

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. Because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Child Porn Report* at ii, xi, 209, 323.

**D. Original Guideline.**

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2 "in terms that are persuasive on policy grounds." *Bistline*, 665 F.3d at 763, 764. The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; *see also Phinney*, 599 F. Supp. 2d at 1043. The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991. That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991). The Commission expressed concern that raising penalties even higher "may aggravate this below guideline rate and heighten sentencing disparity." *Id.* Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

In declining to follow § 2G2.2 on policy grounds, this Court will be in good company.

Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe. *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, tbl.8 (2010).20 And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%). *Id*. tbl.11. As more fully set forth in Part II, *supra*, judges sentence below the guideline range recommended by § 2G2.2, sometimes far below, in the large majority of cases. Congress directed the Commission to take this data into account in reviewing and revising the guidelines, *see* 28 U.S.C. § 994(o), and it is in the process of attempting to do so. *See* U.S. Sent'g Comm'n, *History* at 1 nn.4, 8; *Child Porn Report* at ii, 322-23.

## V. Policy Statements

As the Supreme Court said in *Rita*, a defendant's argument for a lower sentence may "take *either* of two forms." 551 U.S. at 344 (emphasis added). The defendant may "argue *within the Guidelines' framework*, for a departure." *Id*. (emphasis in original). Or, the defendant may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a lower sentence." *Id*. (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)). As the Court recognized in *Irizarry*, "'departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708, 714 (2008). A departure can "only be made based on the 'the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission,'" but "there is no longer a limit comparable . . . on the variances that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a)." *Id.*

at 714-15.mWhile a district court must consider "pertinent" policy statements, 18 U.S.C. §

3553(a)(5), policy statements are "pertinent" only to the first kind of argument the Supreme

Court identified in *Rita*: "departures." Mr. Dunning seeks a variance, not a "departure." Thus,

these policy statements do not apply to the variance Mr. Dunning requests.

## A. Variance.

The Supreme Court excised 18 U.S.C. § 3553(b)(1) because, by virtue of the standard

contained therein (and still cited and quoted throughout the Commission's policy statements) and

its incorporation of the Commission's policy statements by reference ("court shall consider only

the sentencing guidelines, policy statements, and official commentary" in determining whether a

"circumstances was adequately taken into consideration"), it made the guidelines mandatory. *See*

*United States v. Booker*, 543 U.S. 220, 234-35 (2005) (finding the guidelines were mandatory,

and thus unconstitutional, because "departures are not available in every case, and in fact are

unavailable in most"); *id*. at 245, 259 (excising § 3553(b)(1)). For the same reason, all of the

courts of appeals, including the Sixth Circuit, have held that § 3553(b)(2) must be excised as

well. *United States v. Shepherd*, 453 F.3d 702, 704 (6th Cir. 2006). Thus, a variance may not be

denied on the basis of policy statements that prohibit or discourage a departure.

In *Gall*, the Supreme Court upheld a variance to probation based on factors the

Commission's policy statements prohibited, *i.e.*, voluntary withdrawal from a conspiracy and

discontinuing the use of drugs, or deemed "not ordinarily relevant," *i.e.*, age, education, and

employment. 552 U.S. at 51-60. In approving the judge's reliance on these factors, the Supreme

Court disregarded the Commission's policy statements and imposed no requirement that district

courts consider them. In doing so, the majority rejected Justice Alito's argument in dissent that

43

the policy statements should be given "some significant weight." *Id.* at 61-68 (Alito, J.,

dissenting). The Court also rejected the Eighth Circuit's "extraordinary circumstances" test for a

variance. *Id*. at 46. Thus, a variance may not be denied based on a policy statement that prohibits

consideration of family circumstances, or based on policy statements that permit consideration of

age and physical impairments only if "present to an unusual degree and distinguish the case from

the typical cases covered by the guidelines," USSG §§ 5H1.1, 5H1.4, a standard that is

indistinguishable from the "extraordinary circumstances" test rejected in *Gall*.

In *Pepper v. United States*, 131 S. Ct. 1229 (2011), the Supreme Court rejected the Eighth

Circuit's bar on considering post-sentencing rehabilitation. *Id.* at 1241-42. It held that post-

sentencing rehabilitation is "highly relevant to several of the § 3553(a) factors," including the

history and characteristics of the defendant, the need for deterrence, incapacitation, and

rehabilitation, and "may also critically inform the sentencing judge's overarching duty under §

3553(a) to 'impose a sentence sufficient, but not greater than necessary'" to serve the purposes of

sentencing. *Id.* at 1242. In Pepper's case, there was "no question" that Pepper's post-sentencing

rehabilitation—which included successful drug treatment, education, employment, and a

renewed relationship with his father—was relevant to his history and characteristics, shed light

on his likelihood of committing further crimes, suggested a diminished need for further

correctional treatment, and "[bore] directly on the District Court's overarching duty to 'impose a

sentence sufficient, but not greater than necessary' to serve the purposes of sentencing." *Id.* at

1242-43. Moreover, the Court emphasized, 18 U.S.C. § 3661 provides that "[n]o limitation shall

be placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court may receive and consider for the purpose of imposing an

appropriate sentence." The Court therefore held that the Eighth Circuit's rule barring the

consideration of these circumstances contravened §§ 3553(a) and 3661. *Id.* at 1241-43. In this part of its opinion, the Supreme Court did not mention §5K2.19, a policy statement prohibiting consideration of post-sentencing rehabilitation. In a different part of the opinion, the Court responded to an argument by *amicus* appointed by the Court to defend the Eighth Circuit's judgment that the outcome should be governed by §5K2.19. *Id.* at 1247. It found that the policy statement rests on "wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted." *Id.* at 1247. The Court rejected, consistent with its decision in *Gall*, amicus's suggested rule that would "elevate" §3553(a)(5) over factors that are relevant under § 3553(a)(1)and (2), and directed the district court to give "appropriate weight" to those relevant factors. *Id.* at 1249-50.

The question here is whether or not the characteristics of the defendant are relevant to the purposes of sentencing under § 3553(a)(2) and the court's overarching duty to impose a sentence that is sufficient but not greater than necessary to satisfy those purposes.

**VI. There is no logical difference between receipt and possession of child pornography.**

There is no logical difference between possession and receipt of child pornography. According to the law review article, *A Distinction Without A Difference: "Receipt" and "Possession" of Child Pornography and the Double Jeopardy Problem*, "18 U.S.C. § 2252 imposes a mandatory five-year minimum sentence for defendants convicted of "receiving" child pornography, but "possessing" child pornography carries no mandatory minimum sentence." *Stephen L. Bacon, A Distinction Without A Difference: "Receipt" and "Possession" of Child Pornography and the Double Jeopardy Problem, 65 U. Miami L. Rev. 1027, 1030 (2011).* But logically, there are no difference between "receipt" and "possession". "[It is] impossible to

"receive" child pornography without "possessing" it…. Likewise, it is impossible to "possess" child pornography without "receiving" it, except for the rare instance when the possessor is the one who produced the pornography. So, as Judge Posner recognized, 'the puzzle is why receiving . . . should be punished more severely than possessing, since possessors, unless they fabricate their own pornography, are also receivers.'" *Id.(quoting  United States v. Richardson*, 238 F.3d 837, 839 (7th Cir. 2001) (Posner, J.). Therefore, all cases involving "possession" can also be "receipt" cases as long as the defendant did not actually produce the material.  "Federal prosecutors …can always hedge the risk that a judge will depart downward by charging defendants with just "receipt."  "This effectively ties the judge's hands and ensures that the defendant will serve five years in prison if convicted, regardless of what he would have been sentenced to had he been convicted of "possession" alone." *Id.* It is the thought of the undersigned that this illogical distinction could be the basis for a variance.


## CONCLUSION

For the reasons stated, Mr. Dunning respectfully requests that this Court grant his request for a variance and impose some term of imprisonment , a period of home detention with electronic monitoring that is significant in this Court's judgment (with credit for the home incarceration of two years served), and ten years of supervised release with the conditions that he register as a sex offender with the State of Kentucky, and undergo any further treatment deemed necessary by the Probation Officer.

Respectfully submitted,

/s/ Stephen W. Owens

Stephen W. Owens
P.O. Box 1426
Pikeville, KY 41501
(606) 437- 6520
(606) 437-6521 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Motion has been electronically filed with the U.S. District Court and all proper parties were served via same.

/s/ Stephen W. Owens
Stephen W. Owens